## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **YEMAL CALDERÓN AMEZQUITA IN HIS PERSONAL CAPACITY AND AS THE SOLE HEIR OF HIS LATE FATHER CARMELO CALDERÓN MARRERO**<br><br>Plaintiff,<br><br>v.<br><br>**DR. VICTOR RIVERA CRUZ, HIS SPOUSE AND THE CONJUGAL LEGAL PARTERSHIP CONSTITUTED BETWEEN THEM; DOCTORS' CENTER HOSPITAL BAYAMÓN, INC.; DR. ANDRÉS ÁVILA GONZÁLEZ, HIS SPOUSE AND THE CONJUGAL LEGAL PARTERSHIP CONSTITUTED BETWEEN THEM; DR. ÁNGEL TORRES SÁNCHEZ, HIS SPOUSE AND THE CONJUGAL LEGAL PARTERSHIP CONSTITUDED BETWEEN THEM; CORPORATION Z; INSURANCE COMPANIES A, B, C, D y E; DR. JOHN DOE; DR. JOHN ROE; MAX DOE; AND MAX ROE**<br><br>Defendants. | Civil No.<br><br><br>Re.: TORT; MEDICAL MALPRACTICE; HOSPITAL LIABILITY<br><br>**JURY TRIAL REQUESTED** |

## **COMPLAINT**

COMES NOW Plaintiff Yemal Calderón Amezquita, through the undersigned attorney, and respectfully states and prays as follows:

## I.   INTRODUCTION

1.      In this diversity medical malpractice suit, plaintiff Yemal Calderón Amezquita ("Yemal") seeks legal redress for all the damages caused by those who negligently let his father die.

2.      The facts that led to this suit began late at night on January 23, 2016.

3.      On that date, afflicted by abdominal pain, Yemal's father, Mr. Carmelo Calderón Marrero ("Mr. Calderón") arrived at the Emergency Room of Doctors' Center Hospital Bayamón, Inc. ("the Hospital").

4.      On January 24, 2016, **at 12:30 a.m.**, Hospital personnel administered an abdominal CT Scan to Mr. Calderón.  See **Exhibit I**.

5.      **More than sixteen hours** went by before anyone at the Hospital read Mr. Calderón's abdominal CT Scan. Id.

6.      The CT Scan showed that Mr. Calderón had a perforated intestine. Id.

7.      To save his life, Mr. Calderón needed immediate emergency surgery.

8.      Because Mr. Calderón had become severely dehydrated and developed other medical complications while waiting unattended at the Hospital's Emergency Room, the Hospital's surgeon could not perform surgery immediately.

9.      Mr. Calderón's surgery commenced on January 25, 2016 at approximately 7:45 am—by then, **31 hours had gone by** from the moment in which Hospital personnel administered the abdominal CT Scan to Mr. Calderón.

2

10.     When Mr. Calderón went under the knife, his health had already crossed the point of no return; his eventual passing was inevitable.

11.     Indeed, Mr. Calderón never left the Hospital's premises again and died at the Intensive Care Unit after **a 29-day long hospitalization** plagued with suffering and pain.

## II.     JURISDICTION AND VENUE

12.     This Honorable Court has jurisdiction to entertain this case pursuant to 28 U.S.C. § 1332, as there is complete diversity between the plaintiff and the defendants.

13.     The relief requested in this case exceeds the jurisdictional amount of $75,000, exclusive of interests and costs.

14.     Pursuant to 28 U.S.C. § 1391 (a)(2), venue is proper in this Honorable Court because the acts and omissions giving rise to the Complaint occurred within this District.

## III.     THE PARTIES

15.     Yemal is the eldest of Mr. Calderón's three children.[1]

16.     Yemal is married and has two children, ages 7 and 5.

17.     Yemal lives in the State of Florida, where he works as an emergency care doctor in the emergency room of a local hospital.

18.     Yemal is also a Major in the United States Army and has served for 15 years.

---

[1] Yemal's sister and brother repudiated their inheritance by public deed, and Yemal is Mr. Calderón's sole heir.

3

19.     When the events that give rise to this suit happened, Dr. Victor Rivera Cruz ("Dr. Rivera") was an employee of the Hospital, its subcontractor and/or had medical privileges there.

20.     Dr. Rivera, who was on duty at the Hospital on January 23 and 24 of 2016, was one of the healthcare professionals in charge of Mr. Calderón at the Hospital's Emergency Room.

21.     The Dr. Rivera conjugal partnership, constituted between Dr. Rivera and his wife is liable for the damages caused by Dr. Rivera while engaging in those activities which benefited the conjugal partnership.

## IV.     THE FACTS

### A. Mr. Calderón's personal background

22.      Mr. Calderón was born on November 3, 1947.  He grew up in a humble home with seven siblings in a low-income neighborhood of Toa Baja, Puerto Rico.

23.      Mr. Calderón's athletic abilities flourished early on in his life. Mr. Calderón was a gifted track and field athlete, but he excelled the most in the baseball diamond.

24.      Throughout his whole life, Mr. Calderón valued the rigor and discipline that the practice of sports instills.  He exercised daily and always took pride in being in good physical shape.

25.     Mr. Calderón was one of the first members of his family to attend college, where he obtained a bachelor's degree in pedagogy.

26.     He distinguished himself as a mathematics teacher at the elementary level of the Puerto Rico public school system.

27.     Mr. Calderón married with the love of his life at age 28.  His three children came soon thereafter.

### B. THE CALDERÓN FAMILY

28.     With love and devotion, Mr. Calderón and his wife made sure that Yemal and his siblings grew up to become productive, law abiding citizens.

29.     Guiding by example, Mr. Calderón taught his children to value the discipline that comes with hard work.  Watching his father, Yemal learned from an early age how to set and reach goals, to be respectful to others, and to find happiness in life's simple things.

30.     Mr. Calderón, Yemal and their family enjoyed weekend beach outings.  They often visited "Isla de Cabra" beach and the Dorado coast.

31.     In the summer, the Calderón family regularly vacationed at Cabo Rojo and Guánica.  Mr. Calderón was always the first to rise in the morning; he always wanted to get the best spot at the beach for the family. He would have everything ready to go the night before: the "hibachi," beach shares and towels, the domino table, the food and the beach cooler full of ice and refreshments.

32.     The Calderón family also enjoyed the Christmas season together.  As a family tradition, Mr. Calderón, Yemal and his siblings would always decorate together their house with Christmas motives.  They would then welcome relatives on Christmas Day, New Year's and Three Kings Day.

33.     The Calderón family had also their share of difficult times.

34.     Yemal's sister was diagnosed with lupus at age 15, and she received a kidney transplant in 2005. For many years, Mr. Calderón routinely accompanied Yemal's sisters to dialysis sessions three times per week. Mr. Calderón was the first to undergo compatibility tests when his daughter's kidneys had to be replaced.

35.     At an early age, Yemal's youngest brother lost his hearing in the left ear.  Despite many financial difficulties, Mr. Calderón and his wife always did all within their reach to make sure that he had the tools needed to successfully cope with the challenges his condition would bring. Yemal's brother thrived during childhood thanks to their support.

### C. Mr. Calderón and Yemal

36.     Being the eldest son, Yemal and his father had a special bond. They shared the same passion for sports, and Mr. Calderón often found himself as coach of most of Yemal's sport teams.

37.     During his teen years, Yemal trained religiously with Mr. Calderón at the track—one of Yemal's high school goals was to beat Mr. Calderón's high school record in the 400-metre dash.

38.     As Yemal grew older, Mr. Calderón became his confidant and adviser.

39.     Yemal always turned to his father for advice and support in difficult times. When Yemal was deployed to active military service in the Middle East, Mr. Calderón's weekly letters with advice and words of encouragement helped him pull thru the daily challenges of war.

40.     Yemal also cherished the relationship Mr. Calderón had with his grandchildren, whom he visited in the States and regularly kept in touch with by phone.

41.     For Yemal, Mr. Calderón was not only his father and role model but also his closest and dearest friend.

### D. MR. CALDERÓN'S RETIRES TO ENJOY THE GOLDEN YEARS OF HIS LIFE

42.     After 30 years of public service as elementary school teacher, Mr. Calderón retired in 2001 to devote all his time to the family.

43.     Mr. Calderón was in his early fifties, and he thought to have the second half of his life waiting ahead.

44.     During those years, Mr. Calderón saw his children blossomed into adulthood.

45.     He attended the college graduations of his two youngest children; both followed his footsteps and became teachers.

46.     Mr. Calderón later attended Yemal's graduation from Medical School.  He watched proudly as Yemal immersed himself in the practice of emergency medicine.

47.     During those years, Mr. Calderón attended Yemal's wedding and that of Yemal's brother. Yemal became a father of two, and Mr. Calderón had the joy of becoming a grandparent.

### E. MR. CALDERÓN HAD JUST TURNED 68 IN JANUARY 2016

48.      In January 2016, Mr. Calderón had just turned 68 years young.

49.      He was in good physical shape. As done throughout his life, Mr. Calderón continued to exercise daily and took good care of his body.

50.      Although Mr. Calderón had to monitor his blood pressure, he controlled it with ease through medication and a healthy lifestyle.

51.      At 68, Mr. Calderón had everything going for him, and he planned to enjoy a long and full life with his children and grandchildren.

52.      Everything changed on January 23, 2016. That day, Mr. Calderón arrived at the Hospital, and a fatal nightmare began.

**F. Mr. Calderón goes to the Hospital's Emergency Room**

53.      Late in the afternoon of January 23, 2016, after attending mass with his sister, Mr. Calderón drove himself to a local clinic in Toa Alta afflicted with abdominal pain.

54.      The clinic ordered Mr. Calderón to be transferred to the Hospital.

55.      Mr. Calderón arrived at the Hospital by ambulance around 10:00 p.m. that same day.

56.      According to entries in the medical record provided by the Hospital, Mr. Calderón was evaluated by a Hospital's triage nurse at 11:37 p.m.

57.      Those same entries state that Mr. Calderón was alert, oriented and stable when the triage nurse examined him.

58.      The medical record reflects that at the time of his arrival to the Hospital, Mr. Calderón's neurologic, hematopoietic, renal, hepatics, endocrinal, and pulmonary functions **were normal**.

59.     The medical record also states that Mr. Calderón did not suffer from renal failure or any immunologic disorder when he arrived at the Hospital's Emergency Room on January 23, 2016.

60.     The triage sheet in the medical record shows that Mr. Calderón personally provided all information required from him on arrival at the Hospital's Emergency Room.

61.     The triage sheet generated at the Hospital shows that Mr. Calderón indicated that he was afflicted by strong abdominal pain.

62.     According to the medical record provided by the Hospital, the nurse who performed the triage classified Mr. Calderón's condition as an emergency.

63.     The medical record contains an entry showing that Dr. Ávila examined Mr. Calderón for the first time at 12:25 a.m.

64.     In other word, Dr. Ávila examined Mr. Calderón for the first time **almost an hour after** the Hospital's triage nurse had stated that he presented an emergency condition.

65.     On information and belief, Dr. Torres also examined Mr. Calderón at the Hospital's Emergency Room.

66.      On information and belief, Dr. Doe and Dr. Roe also examined Mr. Calderón at the Hospital's Emergency Room and/or oversaw the personnel who examined him.

67.     Dr. Ávila ordered no medication to palliate Mr. Calderón's abdominal pain.

68.     Dr. Torres ordered no medication to palliate Mr. Calderón's abdominal pain.

69.     Dr. Doe and Dr. Roe ordered no medication to palliate Mr. Calderón's abdominal pain.

70.     The certified medical record provided by the Hospital shows that Dr. Ávila never ordered intravenous hydrating treatment for Mr. Calderón.

71.     The certified medical record provided by the Hospital shows that Dr. Torres never ordered intravenous hydrating treatment for Mr. Calderón.

72.     The certified medical record provided by the Hospital shows that Dr. Doe and Dr. Roe never ordered intravenous hydrating treatment for Mr. Calderón.

73.     The documentation in the medical record neither shows that Dr. Ávila addressed the fact that Mr. Calderón could not eat food or drink liquids due to his abdominal pain.

74.     Dr. Ávila, Dr. Torres and the Hospital's Emergency Room personnel ignored Mr. Calderón's symptoms and failed to diagnose and address the emergency threatening his life.

75.     The certified medical record provided by the Hospital indicates that Mr. Calderón was administered an abdominal CT Scan w/o contrast **at 12:30 a.m.** on January 24, 2016.  See **Exhibit I**.

### G. THE HOSPITAL ABANDONS MR. CALDERÓN TO HIS OWN DEVISES IN A CUBICLE AT THE EMERGENCY ROOM

76.     In the wee hours of January 24, 2016, Hospital personnel handed Mr. Calderón a pint of contrast and instructed him to drink it as soon as possible.

10

77.     The Hospital nurse told Mr. Calderón's youngest son, who had accompanied Mr. Calderón in the ambulance to the Emergency Room, that a CT Scan with contrast would be performed after his father finish drinking the pint that was handed to him.

78.     Sometime thereafter, Dr. Ávila concluded his shift and left the Hospital without reevaluating Mr. Calderón.

79.     The certified medical record provided by the Hospital evinces that Dr. Ávila did not delineate an emergency care plan for Mr. Calderón before leaving his shift on January 24, 2016.

80.     The certified medical record provided by the Hospital shows that Dr. Ávila failed to hand off Mr. Calderón's medical care to another physician before leaving his shift on January 24, 2016.

### H. THE HOSPITAL'S PERSONNEL IGNORE THE CRIES FOR HELP FROM MR. CALDERÓN AND HIS FAMILY

81.     During the early hours of January 24, 2016, Mr. Calderón's youngest son sought assistance from the Hospital's personnel at the Emergency Room, as he witnessed how his father's health began to deteriorate rapidly.

82.     Among other things, Mr. Calderón's son told the Hospital's nurses and doctors that his father could not drink the contrast and that his abdominal pain had increased.  But no one came to examine Mr. Calderón.  Rather, the nurses stated time and time again that Mr. Calderón needed to drink the contrast before anything else could be done.

11

83.     After Dr. Ávila's first intervention at 12:25 a.m. on January 24, 2016, the medical record shows that Mr. Calderón received no other evaluation from the Hospital's doctors in the early hours of that day.

84.     Mr. Calderón's daughter, who had left the Hospital around 1:00 a.m. earlier that same day, returned to the Emergency Room around 9:00 a.m. When she arrived, her brother left the Emergency Room because he was informed that the Hospital's policy was to allow only one person accompanying a patient at time.

85.     At 9:00 a.m., Mr. Calderón had yet to finish drinking the contrast, and his daughter immediately sought out help from nurses and doctors; her father's cries of intolerable pain continued getting worse.

86.     But she received the same response her brother had had many times earlier that day: "until your father finishes drinking the contrast, our hands are tied."

87.     Mr. Calderón continued unattended by the Hospital's doctors during the whole morning of January 24, 2016.

88.     The certified copies of the medical record provided by the Hospital show that no emergency care plan was delineated to treat Mr. Calderón during the morning of January 24, 2016.

### I. MORE THAN SIXTEEN HOURS AFTER MR. CALDERÓN'S ARRIVAL TO THE EMERGENCY ROOM, HOSPITAL PERSONNEL DETERMINE THAT HE HAS A PERFORATED INTESTINE

89.     On January 24, 2016, **at 4:42 p.m.**, a radiologist signed the results of the CT Scan administered to Mr. Calderón **at 12:30 a.m.** that same day. See **Exhibit I**.

90.     The radiologist discussed the results with Dr. Torres at 4:46 p.m. Id.

91.     When the radiologist and Dr. Torres discussed the results, **more than 16 hours had elapsed** since the time the CT Scan had been administered to Mr. Calderón. Id.

92.     The CT Scan showed that Mr. Calderón had a perforated intestine. Id.

93.     The radiologist who signed the results of the CT Scan recommended ruling out a perforated gastric ulcer. Id.

94.     The medical record shows that Dr. Torres discussed the CT Scan results with a Hospital surgeon, and both agreed that Mr. Calderón had acute peritonitis caused by the perforation in his intestines.

### J. THE HOSPITAL IDENTIFIES THE PERFORATED INTESTINE WHEN MR. CALDERÓN'S DEATH IS IMMINENT

95.     On January 24, 2016, Mr. Calderón was admitted to the Hospital.

96.     On January 24, 2016, at 5:41 p.m., **an X Ray** corroborated that Mr. Calderón had a perforated intestine. See **Exhibit II**.

97.     According to the medical record, the Hospital's surgeon examined Mr. Calderón at 6:20 p.m. on January 24, 2016 and concluded that he was severely dehydrated.

98.     Even though Mr. Calderón needed immediate emergency surgery to save his life, the procedure could not be performed before reestablishing his body hydration.

99.     The medical record provided by the Hospital indicates that Mr. Calderón could not undergo surgery on January 24, 2016 due to his state of dehydration and other medical complications.

100.    The certified medical record provided by the Hospital contains lab results from blood tests performed on Mr. Calderón in the afternoon of January 24, 2016.

101.    Those results indicate that Mr. Calderón had hypoxia; a blood pH of 7.22; blood potassium levels of 5.5 mg/dL; and acute renal failure.

## K. THE HOSPITAL ADMITS MR. CALDERÓN TO ITS INTENSIVE CARE UNIT

102.    Mr. Calderón was admitted to the Hospital's Intensive Care Unit on January 24, 2016, at 7:45 p.m.

103.    According to the certified documentation provided by the Hospital, the healthcare professionals who tended to Mr. Calderón diagnosed the following conditions: (i) sepsis syndrome; (ii) respiratory failure; (iii) gut perforation; (iv) compressive atelectasis secondary to abdominal process; and (v) metabolic acidosis.

104.    The medical record also contains diagnoses indicating that Mr. Calderón was in hypovolemic state with oliguria.

105.    When Mr. Calderón was admitted to the Hospital's Intensive Care Unit, his life was in danger.

14

106.    The delay in identifying, diagnosing and treating the symptomatology that Mr. Calderón presented at the Hospital's Emergency Room would eventually cause his death after a prolong hospitalization full of pain and suffering.

### L. Mr. Calderón undergoes surgery more than thirty (30) hours after his arrival to the Hospital's Emergency Room

107.    According to the certified medical record provided by the Hospital, Mr. Calderón underwent surgery at 7:45 a.m. on January 25, 2016.

108.    At 7:45 a.m. of January 25, 2016, **31 hours and 15 minutes** had elapsed since the time Hospital personnel administered the abdominal CT Scan to Mr. Calderón on January 24, 2016 at 12:30 a.m. See **Exhibit I**.

109.    The medical record shows that the Hospital's surgeon documented the following postoperative findings: (i) duodenal ulcer perforation; (ii) generalized peritonitis; and (iii) free intestinal matter in Mr. Calderón's abdomen.

### M. Mr. Calderón dies at the Hospital's Intensive Care Unit after a prolong and painful hospitalization

110.    After the surgery, Mr. Calderón immediately began experiencing the medical complications that invariably follow an intestine perforation that goes untreated for a prolong period of time.

111.    The medical record shows that on January 25, 2016, at 11:43 a.m., Mr. Calderón suffered a cardiac arrest; he was resuscitated and placed on an artificial ventilator.

112.    The Hospital informed Mr. Calderón's children about the cardiac arrest many days after it happened.

15

113.     Also on January 25, 2016, at 4:00 p.m., another doctor at the Hospital documented that Mr. Calderón had respiratory failure and hypovolemic shock.

114.     The medical record shows that, on January 25, 2016, Mr. Calderón was prescribed three different antibiotics.

115.     From January 26th to the 31st, Mr. Calderón continued fighting for his life, but he remained in critical condition.

116.     The medical record provided by the Hospital shows that in those days Mr. Calderón suffered from septic shock and hemodynamic instability.

117.     Mr. Calderón appeared to experience a slight improvement on February 1, 2016, and he was taken off the artificial ventilator.

118.     The certified medical record provided by the Hospital shows that Mr. Calderón had to be intubated again on February 6, 2016.

119.     Also on February 6, 2016, doctors at the Hospital diagnosed yet another condition afflicting Mr. Calderón—that is, metabolic encephalopathy.

120.     By February 6, 2016, due to a suspected cerebrovascular accident, doctors at the Hospital's Intensive Care Unit had ordered to avoid the administration of all sedatives to Mr. Calderón.

121.     The medical record shows that Hospital personnel administered antibiotics to Mr. Calderón regularly, but he experienced yet another septic shock.

122.    After many other medical complications, and despite the indicated medical care provided at the Hospital's Intensive Care Unit, Mr. Calderón died on February 21, 2016 at 2:44 p.m.

123.    The medical record provided by the Hospital indicates that the immediate cause of Mr. Calderón's death was cardiogenic shock, secondary to respiratory failure, pneumonia, septic shock, duodenal perforation, and encephalopathy.

### N. YEMAL'S EXTRAJUDICIAL COMMUNICATIONS WITH CO-DEFENDANTS

134.    On February 18, 2017, Yemal sent extrajudicial claims to all co-defendants in connection with the damages claim in this suit.

135.    Although many co-defendants replied to the extrajudicial communication, a settlement offer has yet to be received.

## V.    CAUSES OF ACTION

### A. FIRST CAUSE OF ACTION: MEDICAL MALPRACTICE UNDER PUERTO RICO CIVIL CODE, ARTICLES 1802 AND 1803

136.    All the allegations stated above are incorporated and realleged below.

137.    Dr. Ávila, Dr. Torres, Dr. Doe, Dr. Roe and all Hospital personnel who interacted with Mr. Calderón on January 23 and 24 of 2016 provided negligent, subpar medical care to him.  They negligently failed to properly and timely identify and treat Mr. Calderón's emergency condition, which eventually caused his death.

138.    Under Article 1802 of the Puerto Rico Civil Code, applicable in this case pursuant to Erie R. Co. v. Tompkins, 304 U.S. 64 (1938), all co-defendants

are jointly and severally liable for the negligent acts and omissions that caused Mr. Calderón's death.

139.     Had co-defendants properly and timely diagnose and treat Mr. Calderón's emergency condition at the Hospital's Emergency Room, he would not have died.

140.     Co-defendants failed to delineate an emergency care plan to identify and treat the root of Mr. Calderón's abdominal pain.

141.     Instead, co-defendants left him waiting unattended in a cubicle at the Hospital's Emergency Room **for more than 16 hours**.

142.     Co-defendants negligently failed to promptly read the abdominal CT Scan administered to Mr. Calderón, as required under its internal policies and protocols, the applicable regulations and the standard of care.

143.     Co-defendants negligently ordered Mr. Calderón to drink a pint of contrast even though it was contraindicated for his emergency condition.

144.     When co-defendants finally identified that Mr. Calderón had a perforated intestine, his health had already crossed the point of no return; by then, his death was imminent.

145.     Due to the negligent acts and omissions of co-defendants, Mr. Calderón became dehydrated and developed other life-threatening complications, all of which precluded the administration of the immediate emergency surgery needed to save his life.

146.     Mr. Calderón died on February 21, 2016 due the negligent acts and omissions of co-defendants.

147.     When Mr. Calderón died, twenty-nine (29) days had elapsed since his arrival at the Hospital's Emergency Room. Those twenty-nine (29) days were full of suffering and pain for Mr. Calderón, Yemal and his family. Co-defendants are jointly and severally liable for Mr. Calderón's death and all other damages claim in this case.

148.     Under Article 1803 of the Puerto Rico Civil Code, the Hospital and Corporation Z are vicariously liable for the negligent acts and omissions of Dr. Ávila, Dr. Torres, Dr. Doe, Dr. Roe and all other Emergency Room personnel who negligently caused Mr. Calderón's death.

149.     Under the insurance policies in effect when the acts and omissions alleged in this case occurred, the Co-defendants' insurance providers are liable for the damages claim in the Complaint.

### B. SECOND CAUSE OF ACTION: HOSPITAL AND COMMERCIAL LIABILITY UNDER ARTICLE 1802 OF THE PUERTO RICO CIVIL CODE

150.     All the allegations stated above are incorporated and realleged below.

151.     The Hospital and Corporation Z had the obligation to put in place rules, procedures, policies and protocols to ensure the safety of all patients who visited the Emergency Room, including Mr. Calderón.

152.     The Hospital was dutybound to comply with Regulation No. 117 issued by the Puerto Rico Department of Health.

153.     Corporation Z was dutybound to comply with Regulation No. 117 issued by the Puerto Rico Department of Health.

19

154.     On information and belief, both the Hospital and Corporation Z negligently failed to comply with Regulation No. 117.

155.     On information and belief, the Hospital and Corporation Z failed to put in place the required rules, procedures, policies and protocols.   In the alternative, the Hospital and Corporation Z failed to abide by the required rules, procedures, policies and protocols.

156.     On information and belief, among other things, the Hospital and Corporation Z negligently failed to ensure that the doctors, nurses and emergency room personnel who interacted with Mr. Calderón and his family had the expertise, knowledge and training to provide proper emergency care.

157.     The Hospital and Corporation Z negligently provided privileges to and/or contracted with doctors such as Dr. Ávila and Dr. Torres, who, on information and belief, were unfit to provide proper emergency medical care to Mr. Calderón.

158.     Mr. Calderón died on February 21, 2016 because the Hospital and Corporation Z negligently failed to comply with their obligations and duties.

159.     Under Article 1802 of the Civil Code, the Hospital and Corporation Z are jointly and severally liable for the damages claim in this case.

160.     Under the insurance policies in effect when the acts and omissions alleged in this case occurred, the Co-defendants' insurance providers are liable for the damages claim in the Complaint.

## VI.    DAMAGES

### A. Damages negligently caused by Co-Defendants to Mr. Calderón

161.    All the allegations stated above are incorporated and realleged below.

162.    Due the negligent acts and omissions of co-defendants, Mr. Calderón suffered a great deal, both physically and mentally, during the twenty-nine (29) days he remained hospitalized at the Hospital.

163.    Among other painful conditions negligently caused by co-defendants during those twenty-nine (29) days, Mr. Calderón suffered from the following:

     i.   acute abdominal pain;

    ii.   peritonitis;

   iii.   dehydration and hypovolemic shock;

   iv.   compressive atelectasia;

    v.   metabolic acidosis;

   vi.   left pleural effusion;

  vii.   respiratory failure;

 viii.   renal failure;

   ix.   acute generalized infections;

    x.   septic shock syndrome;

   xi.   metabolic encephalopathy;

  xii.   cardiac arrests;

 xiii.   pneumonia;

 xiv.   generalized swelling; and

xv. serious skin ulcers and lacerations through his skull and body.

164.    To treat those conditions, Mr. Calderón underwent emergency surgery and remained hospitalized in the Hospital's Intensive Care Unit until the day he died.

165.    At the Intensive Care Unit, Mr. Calderón was intubated several times.

166.    At the Intensive Care Unit, Mr. Calderón's movement was restricted (tying his wrists to the hospital's bed) to preclude his constant attempts to remove the intubation that kept him alive.

167.    Mr. Calderón never ate or drank on his own again; during his prolong stay at the Intensive Care Unit he received parenteral nutrition.

168.    Foley catheters and other artificial means were used to allow Mr. Calderón's body to continue its daily physiological processes.

169.    Mr. Calderón received at least thirty-seven (37) arterial punctures to obtain blood gases.

170.    Mr. Calderón's physical appearance during his hospitalization changed dramatically due to the swelling and other physical manifestations of his critical health condition.

171.    The medical record shows that Mr. Calderón was conscious during the hospitalization at the Hospital's Intensive Care Unit.

172.    In fact, Mr. Calderón received no sedation whatsoever for a significant period of his prolong hospitalization at the Intensive Care Unit.

173.     Mr. Calderón understood the gravity and poor prognosis of his health condition.   The twenty-nine (29) days Mr. Calderón remained hospitalized at the Intensive Care Unit were extremely traumatic and painful for him.

174.     Co-defendants' negligent acts and omissions caused Mr. Calderón's damages and death. The damages jointly and negligently caused by co-defendants to Mr. Calderón are reasonably valued at an amount not lower than $3,000,000.

175.     As Mr. Calderón's sole heir, Yemal has the right to redress the damages negligently caused to his father by co-defendants.

**B. DAMAGES NEGLIGENTLY CAUSED BY CO-DEFENDANTS TO YEMAL**

176.     All the allegations stated above are incorporated and realleged below.

177.     Due to the negligent acts and omissions of co-defendants, Yemal had to endure his father's struggles to remain alive during the twenty-nine (29) days of his hospitalization.

178.     Yemal father's life dwindled slowly and painfully every day spent at the Hospital. This reality still torments Yemal today.

179.     As a direct and proximate result of the negligence of all co-defendants, Yemal was prematurely deprived of the company, unconditional love, support and advice of his father. Yemal also lost the joy of watching his children enjoy the company of their beloved grandfather.

180.     For Yemal, who earns his living as an emergency room doctor, the fact that his father fell victim of medical malpractice in the emergency room setting has been particularly troublesome.

181.     For months, Yemal cried at work almost daily, as he saw resemblance of his father's face in his elderly patients at the emergency room. The same emotion still overcomes Yemal often today.

182.     On his way to work every day, Yemal has always prayed and asked God for help so that every time he touches a patient it is to heal. Yemal suffers greatly knowing that fellow emergency care doctors failed his father as well as their duty to heal.

183.     After the passing of his father, Yemal lost interest in his regular activities.

184.     In June 2016, Yemal resigned from administrative roles assigned to him at work because the loss of his father heavily weighted on him. This decision represented a reduction in Yemal's salary.

185.     For many months after the death of his father, Yemal had trouble sleeping, decreased appetite, reduced motivation and lack of energy.  Those difficulties still often afflict Yemal today.

186.     The sudden loss of his father due to co-defendants' medical malpractice has caused Yemal to develop a major depressive disorder.

187.     The irreparable damages that codefendants have negligently caused to Yemal are reasonably valued at an amount not lower than $3,000,000.

## VII.   JURY TRIAL DEMAND

188.    Yemal demands that all triable issues in this case be decided by a jury.

**WHEREFORE,** Yemal prays that a jury trial be held and judgment entered in his favor and against all Defendants, jointly and severally, for no less than the above-stated sums together with any other applicable remedy deemed just and proper under the facts and circumstances of this case.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 13th day of September 2017.

s/Glenda Labadie Jackson
Glenda Labadie Jackson
USDC-PR No. 216606
g_labadie@yahoo.com
787-222-4344